1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PHILIP JOSEPH SCOMA,

11              Petitioner,              2:  10 - cv - 1953 - GEB TJB

12        vs.

13   DERRAL ADAMS,

14              Respondent.            ORDER, FINDINGS AND

15                                     RECOMMENDATIONS

16   _____/

17                       I.  INTRODUCTION

18        Petitioner, a state prisoner, is proceeding through counsel with a petition for writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of attempted

20   voluntary manslaughter and the jury found true allegations that he personally used a firearm and

21   personally inflicted great bodily injury.  Petitioner was sentenced to ten years imprisonment.

22   Petitioner presents several claims in his federal habeas petition; specifically:  (1) jury

23   instructional error on the attempted voluntary manslaughter instruction ("Claim I"); (2)

24   ineffective assistance of trial counsel ("Claim II"); (3) cumulative error ("Claim III"); (4)

25   ineffective assistance of appellate counsel ("Claim IV"); and (5) insufficiency of the evidence to

26   support the attempted voluntary manslaughter conviction ("Claim V").  For the following

1  reasons, the habeas petition should be denied.

2                          II.  FACTUAL BACKGROUND[1]

3      Joseph Nicholas Scoma (Nicholas), defendant's son, lived with
       defendant at defendant's mobile home.  On August 4, 2003,
4      Nicholas came home and told his father he had quit his job at
       Carl's Jr.  Defendant became angry and started yelling at Nicholas.
5      The argument escalated and the two began pushing each other,
       leading Nicholas to push defendant to the ground at one point.
6      Defendant was overweight and had recently undergone heart
       surgery.  He would argue with Nicholas until he ran out of breath,
7      and then commence arguing again once he caught his breath.  The
       series of arguments lasted about 30 minutes.

8
       Defendant twice swung a metal baseball bat at Nicholas, but
9      missed both times.  One time defendant told Nicholas, "I'll hit you
       in your fucking head" as he swung the bat.  He also tried to hit
10     Nicholas with a metal strip used to separate carpeting from the
       wall.

11
       Defendant eventually told Nicholas to leave.  Nicholas gathered his
12     belongings and started to load them into his car, going in and out of
       the house several times.  He never barred Nicholas from entering
13     or leaving, but there was more pushing and fighting by the front
       door.

14
       Defendant eventually stopped yelling at Nicholas, turned, and
15     reached into a bag of dog biscuits on a counter just inside the front
       door.  He pulled out a plastic bag containing a .38 caliber revolver
16     with a two-inch barrel.  Defendant took the gun out of the bag and
       pointed it at Nicholas's foot.  Defendant pulled the hammer back
17     and told his son "I'll shoot you in your fucking foot."

18     Defendant "[j]ust pointed [the pistol] at me and threatened me and
       then kind of took a couple of steps back.  And then he leaned up
19     against the doorway, just kind of sat there, like he was happy with
       himself."  Nicholas then told defendant to put the gun down,
20     saying "[w]e need to figure something out and we should probably
       do that without the gun."

21
       Defendant fidgeted with the gun, taking it in and out of the plastic
22     bag.  Nicholas was yelling and swearing at defendant by this point.
       He yelled "[p]ut the gun down and let's finish this" to defendant.
23     As he yelled at defendant, Nicholas accidently spit on defendant's
       arm.  Defendant looked at Nicholas and said, "[y]ou spit on me."

24
_____

25         [1] The factual background is taken from the California Court of Appeal, Third Appellate
26  District Opinion dated October 4, 2006 and attached by Respondent to his answer as Exhibit A
    (hereinafter the "Slip Op.").

                                            2

1    He wiped the spit on Nicholas and then shot him.

2    Defendant's eyebrows raised and his eyes were wide when he fired
     the revolver.  The bullet entered Nicholas's right chest just below
3    the clavicle, hit one lung, and stopped next to the spine.  Defendant
     called 911 and asked for an ambulance.  He told the emergency
4    operator that the gun accidently went off when he and Nicholas
     were reaching for it.  Nicholas was in intensive care for five days.
5
     It took about three pounds of pressure to pull the trigger before the
6    revolver would fire, and the revolver could not fire unless the
     trigger was pulled.  According to the prosecution's expert
7    criminalist, defendant could have shot Nicholas from about two to
     three feet away.
8
     A licensed private investigator and firearms expert testifying for
9    the defense tested the plastic bag.  He found the holes and burn
     marks on the bag to be consistent with it having been wrapped
10   around the revolver when it was fired.  The markets and burns
     were also consistent with the bag being held against the revolver
11   with one hand as the revolver was being held with both hands
     when it was fired.
12
13   (Slip Op. at p. 2-4.)

14                         III.  PROCEDURAL HISTORY

15        After Petitioner was convicted and sentenced, he appealed to the California Court of

16   Appeal, Third Appellate District.  Petitioner raised one issue in that appeal, specifically that there

17   was insufficient evidence to support the attempted voluntary manslaughter conviction.  The

18   California Court of Appeal affirmed the judgment in October 2006.  Petitioner then raised his

19   insufficiency of the evidence claim to the California Supreme Court in a petition for review.  The

20   California Supreme Court denied the petition for review in December 2006.

21        Petitioner then filed a state habeas petition in the Superior Court of California, County of

22   Shasta which raised the issues Petitioner raises in his federal habeas petition.  The Superior Court

23   denied the state habeas petition in a written decision in August 2008.  Petitioner then filed a state

24   habeas petition in the California Court of Appeal which was summarily denied.  Petitioner's state

25   habeas petition to the California Supreme Court was summarily denied in June 2009.

26        Petitioner filed his federal habeas petition in July 2009 in the Northern District of

                                              3

1    California.  He filed an amended federal habeas petition in March 2010.  The matter was

2    transferred from the Northern District of California to this district in July 2010.  Respondent

3    answered the petition on December 1, 2010.  Petitioner then filed a traverse in January 2011.

4    The matter was reassigned to the undersigned by Chief Judge Ishii in July 2011.

5                        IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

6            An application for writ of habeas corpus by a person in custody under judgment of a state

7    court can only be granted for violations of the Constitution or laws of the United States.  See 28

8    U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

9    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

10   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

11   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

12   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

13   decided on the merits in the state court proceedings unless the state court's adjudication of the

14   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

15   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

16   resulted in a decision that was based on an unreasonable determination of the facts in light of the

17   evidence presented in state court.  See 28 U.S.C. 2254(d).

18           As a threshold matter, this Court must "first decide what constitutes 'clearly established

19   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

20   538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

21   under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

22   at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

23   application clause, a federal habeas court making the unreasonable application inquiry should ask

24   whether the state court's application of clearly established federal law was "objectively

25   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

26   not issue the writ simply because the court concludes in its independent judgment that the

4

1    relevant state court decision applied clearly established federal law erroneously or incorrectly.

2    Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

3    law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

4    determining whether a state court decision is an objectively unreasonable application of clearly

5    established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

6    the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

7    applied, we may look for guidance to circuit precedents.").

8        The first step in applying AEDPA's standards is to "identify the state court decision that

9    is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

10   When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

11   last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

12                          V.  ANALYSIS OF PETITIONER'S CLAIMS

13       A.  Claim I

14       In Claim I, Petitioner asserts that the jury was improperly instructed on the intent required

15   to support a conviction for attempted voluntary manslaughter.  Petitioner raised this Claim in his

16   state habeas petitions.  Specifically, Petitioner asserts that the instructions given to the jury forced

17   the jury to convict Petitioner on a general intent theory as opposed to a specific intent to kill.

18   (See Pet'r's Am. Pet. Mem. of Points & Auth. at p. 32.)  Petitioner argues that the instructions

19   were in error because the "jury is being directly told that the crime [of attempted voluntary

20   manslaughter] occurs when there is no intent to kill."  (Id.)

21       The last reasoned decision on this Claim was from the Superior Court, County of Shasta

22   which held that, "[t]he opinion of the Third District Court of Appeal found the record established

23   that there was sufficient evidence for the jury to find petitioner had the intent to kill his son.

24   Therefore, the ruling of the appellate court has effectively rendered this issue moot."  (Respt's

25   Lodged Doc. No. 7 at p. 1.)

26       A challenge to a jury instruction solely as an error of state law does not state a claim

                                          5

cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S 152, 169 (1982). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or influence in determining the jury's verdict.  See, e.g., Hedgpeth v. Pulido, 555 U.S. 57, 61-62 (2008) (per curiam).

The jury was instructed as follows on attempted voluntary manslaughter:

A lesser included crime to attempted murder is the crime of attempted voluntary manslaughter, in violation of sections 664 and 192, subdivision (a) of the Penal Code.  Every person who unlawfully attempts without malice aforethought to kill another human being is guilty of the crime of attempted voluntary manslaughter in violation of sections 664 and 192, subdivision (a) of the Penal Code, a crime.

Voluntary manslaughter is the unlawful killing of a human being without malice aforethought.  There is no malice aforethought if the killing or attempted killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself or another person against imminent peril or great bodily injury.

*In order to prove this crime, each of the following elements must be proved:*
*1.  A direct but ineffectual act was done by one person towards killing another human being; and*
*2.  That person had the specific intent to kill the other person;*
*3.  The actions taken to kill were unlawful.*

In deciding whether a direct but ineffectual act was committed, it is

6

1   necessary to distinguish between mere preparation, on the one
2   hand, and the actual commencement of the doing of the criminal
    deed, on the other.  Mere preparation, which may consist of
3   planning the killing or of devising, obtaining or arranging the
    means for its commission, is not sufficient to constitute an attempt.
4   *However, acts of a person who intends to kill another person will
    constitute an attempt where those acts clearly indicate a certain,
5   unambiguous intent to kill.*  The acts must be an immediate step in
    the present execution of the killing, the progress of which would be
6   completed unless interrupted by some circumstances not intended
    in the original design.

7   (Clerk's Tr. at p. 197-98 (emphasis added).)

8       The jury was then also specifically instructed as to how to properly distinguish between

9   murder and manslaughter:

10      The distinction between murder and manslaughter is that murder
        requires malice while manslaughter does not.
11
        When the act causing the death, though unlawful, is done in the
12      heat of passion or is excited by a sudden quarrel that amounts to
        adequate provocation, in the actual but unreasonable belief in the
13      necessity to defend against imminent peril to life or great bodily
        injury, the offense is manslaughter.  In that case, even if an intent
14      to kill exists, the law is that malice, which is an essential element
        of murder, is absent.
15
        To establish that a killing is murder and not manslaughter, the
16      burden is on the People to prove beyond a reasonable doubt each of
        the elements of murder and that the act which caused the death was
17      not done in the heat of passion or upon a sudden quarrel or in the
        actual, even though unreasonable, belief in the necessity to defend
18      against imminent peril to life or great bodily injury.

19  (Id. at p. 198.)

20      When read and considered as a whole as a federal habeas court is required to do,

21  Petitioner fails to show that the jury instructions violated his due process rights.  The jury was

22  specifically instructed that one of the elements to find Petitioner guilty of attempted voluntary

23  manslaughter was that he had "the specific intent to kill the other person."  Furthermore, as

24  illustrated above, when distinguishing the definitions of manslaughter and murder, the jury was

25  instructed that the difference is that attempted murder requires malice whereas attempted

26  manslaughter did not.  The trial court did not instruct the jury that manslaughter did not require a

7

1   specific intent to kill.  Instead, it specifically laid out the requirements for attempted voluntary

2   manslaughter, one of which was a specific intent to kill.  The jury is deemed to have followed

3   this instruction.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  The jury instructions cannot

4   be read in isolation, but must be read as a whole in determining whether Petitioner's due process

5   rights were violated.  See Estelle, 502 U.S. at 72.  Based on the foregoing, Petitioner fails to

6   show that his due process rights were violated for the reasons described above.  Therefore, Claim

7   I should be denied.[2]

8          B.  Claim II

9          In Claim II, Petitioner makes three separate and distinct ineffective assistance of trial

10  counsel arguments.  Specifically, Petitioner asserts that counsel was ineffective by:  (1) failing to

11  impeach Nicholas with evidence of marijuana found in his system; (2) misadvising Petitioner as

12  to the maximum prison time exposure he could face if convicted; and (3) allowing the trial court

13  to take into account the statements taken from the victim impact statement and the presentence

14  report.  The last reasoned decision on this Claim was from the Superior Court, County of Shasta

15  on Petitioner's state habeas petition.  That court stated the following in resolving these issues:

16             Petitioner argues that trial counsel was ineffective for several
              reasons:  a) failing to impeach the victim with evidence that he was
17             under the influence of marijuana at the time of the incident; b)
              advising petitioner that the maximum sentence he was facing was
18             felony probation; and c) failing to object to items in the Victim
              Impact Statement.
19
20             The California Supreme Court set forth the standard that must be

21          [2] The Superior Court found that this Claim was "moot" in light of the finding by the
22  California Court of Appeal on Petitioner's sufficiency of the evidence claim raised on direct
    appeal.  However, simply because the California Court of Appeal found that there was sufficient
23  evidence presented at trial to convict Petitioner of attempted voluntary manslaughter does not
    necessarily "moot" his jury instructional error argument.  To the extent that the state court
24  decision could be read as an unreasonable application of clearly established federal law, the
    Claim would be reviewed de novo.  See Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en
25  banc) ("[I]t is now clear both that we may not grant habeas relief because of § 2254(d)(1) error
    and that, if there is such error, we mus decide the habeas petition by considering de novo the
26  constitutional issues raised.").  However, even if AEDPA deference did not apply and de novo
    review applied, the Claim would still be denied for the reasons described supra.

met for a writ of habeas corpus to issue based upon ineffective assistance of counsel.

> To establish that counsel's assistance was sufficiently ineffective to justify the issuance of a writ of habeas corpus, petitioner must first demonstrate that counsel's performance "'fell below an objective standard of reasonableness . . . under prevailing social norms.'" (<u>Ledesma</u>, at p. 216, quoting <u>Strickland v. Washington</u> (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-94, 104 S.Ct. 2052].)  (4) This determination generally must be made with deference to avoid the dual pitfalls of second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel "to defend himself against a claim of ineffective assistance after trial rather than to defendant his client against criminal charges at trial . . . ." (<u>Ledesma</u>, at p. 216.) However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions."  (<u>Id.</u> at p. 217.)

> Petitioner must also demonstrate that counsel's deficient performance prejudiced his defense. Prejudice generally requires an affirmative showing that, absent counsel's errors, there is a reasonable probability of a more favorable outcome. (<u>Ledesma</u>, at p. 218.)  A "reasonable probability" is not a showing that "counsel's conduct more likely than not altered the outcome in the case," but simply "a probability sufficient to undermine confidence in the outcome."  (<u>Strickland v. Washington</u>, 466 U.S. at pp. 693-694 [80 L.Ed.2d at p. 697-698].)

<u>In re Cordero</u> (1988) 46 Cal.3d 161, 180.

a.  Failing to Impeach the Victim.  The decision not to attempt to impeach the victim with marijuana in his system was a tactical decision made by the trial attorney.  That decision was not one that fell below the objective standard of reasonableness under the circumstances here.

b.  Maximum Possible Sentence.  Petitioner's claim he was misadvised regarding the sentence he was facing is patently not credible.  He was receiving offers of 32 years in prison and 20 years in prison from the deputy district attorney.  Petitioner was

1

2

3

> charged with attempted murder involving the use of a gun.  Under
> these circumstances the petitioner was clearly aware he was facing
> significant state prison time, if convicted, and his claim he was not
> so advised is ludicrous.

4

5

6

> c. Victim Impact Statement.  It was a judge and not the jury that
> heard and read the victim impact statement.  The judge has the
> ability to separate the facts from the fiction.  In light of the fact that
> petitioner was sentenced to the mid term, there is no evidence that
> the result would have been more favorable to petitioner had the
> objection been made.

7   (Resp't's Lodged Doc. 7 at p. 1-3.)

8                  i.  Failing to Impeach the Victim

9          In Petitioner's first ineffective assistance argument, he asserts that trial counsel was

10  ineffective for failing to impeach Nicholas with evidence of marijuana found in his system.  The

11  Sixth Amendment guarantees effective assistance of counsel.  In Strickland v. Washington, 466

12  U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective assistance

13  of counsel.  First, the petitioner must show that considering all the circumstances, counsel's

14  performance fell below an objective standard of reasonableness.  See id. at 688.  Petitioner must

15  identify the acts or omissions that are alleged not to have been the result of reasonable

16  professional judgment.  See id. at 690.  The federal court must then determine whether in light of

17  all the circumstances, the identified acts or omissions were outside the range of professional

18  competent assistance.  See id.

19         Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

20  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

21  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

22  probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

23  not determine whether counsel's performance was deficient before examining the prejudice

24  suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

25  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

26  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

1  697).

2      In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption

3  that counsel's performance falls within the 'wide range of professional assistance.'" Kimmelman

4  v. Morrison, 477 U.S. 365, 381 (1986).  In addition, there is a strong presumption that counsel

5  "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg,

6  898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  Thus, a reasonable

7  tactical decision by counsel with which the defendant disagrees cannot form the basis of an

8  ineffective assistance of counsel claim.  See Strickland, 466 U.S. at 689.  A court does not

9  consider whether another lawyer with the benefit of hindsight would have acted differently than

10 trial counsel.  See id.  Instead, a court considers whether counsel made errors so serious that

11 counsel failed to function as guaranteed by the Sixth Amendment.  See id. at 687.

12     Petitioner fails to show that the Superior Court's decision on this ineffective assistance of

13 counsel argument warrants granting federal habeas relief.  Before the start of trial, a hearing was

14 held on the issue of the victim's marijuana use as well as the Petitioner's methamphetamine use

15 between the trial court, Petitioner's trial counsel (Wilson) and the prosecutor (Omura).  The

16 record indicates the following from that hearing:

17          MR. OMURA: Your Honor, it is my understanding that the
            defense wants to get into a positive test for marijuana metabolite
18          that was in the victim's medical records as he was undergoing
            procedures to repair a collapsed lung from a gunshot.  I have been
19          given no information as to why that is relevant, simply to dirty up
            the victim.  Whatever the reason that makes the victim's use of
20          marijuana for the previous week or two – my understanding is up
            to ten or fourteen days – whatever the reason to support that
21          introduction of evidence, I think would bolster my assertion that
            the defendant's use of methamphetamine during this incident and
22          immediately preceding this incident is also admissible and relevant
            to explain the defendant's actions.
23          To explain and support that, I would tell the Court that the victim
            came home from a bike riding trip, he was gone overnight with a
24          friend.  When he returned, the defendant was immediately in his
            face because the victim had gotten fired from his job for going on
25          this trip, basically.
            The victim told the police that the defendant was under the
26          influence of methamphetamine, obviously, when he got home,

1   immediately the defendant started to get in his face.  They had an
argument, which usually occurred when the defendant was under

2   the influence of methamphetamine.  During that 45 minutes to an
hour-and-a-half the defendant would lose his breath because of his

3   heart operation that he'd undergone some time in the past, would
disappear down the hallway to his bedroom, and return in a few

4   minutes, having his breath restarted.

And the victim knows from prior experience with the defendant, he

5   knows that he's smoking his methamphetamine pipe.  That
happened at least once during the incident, during the fighting

6   incident, on top of the fact that the victim will testify the defendant
was under the influence before he got home, before the fight.

7   I expect that if the Court allows me, the sheriff's deputies will
testify that it is common knowledge through their training and

8   experience that people who are under the influence of
methamphetamine are more likely to be violent, to engage in

9   violent activities, and that would put the victim's testimony in line
with what the victim observed, and that is the defendant being

10   under the influence, having smoked a pipe during the incident, and
then pointing the gun at the victim and pulling the trigger.

11   THE COURT:  Okay.  Mr. Wilson?

MR. WILSON:  All that is fine, except for the tape recording of the

12   victim.  He said that he went down the hallway several times.  He
said on the tape, I don't know if he was smoking

13   methamphetamine.  It blows everything Mr. Omura said out of the
water.  He cannot state – the victim himself states, I can't say

14   whether he was smoking methamphetamine.

Under 352 the methamphetamine testimony is more prejudicial

15   than probative.  The problem I have if the doctor testifies, and
there's a foundation for the effects of the marijuana on memory

16   because the recollection is going to be very important, the
recollection of the facts by the victim, and if he's under the

17   influence of marijuana, and it does impair your memory and
recollection, and certainly it goes towards that that would be my

18   only – my only reason.  I'm certainly not going to argue that
marijuana makes him violent.  I'm just saying there are some

19   points that are going to come up during the cross-examination and
direct examination that, in fact, two days after the incident, the

20   victim was unclear as to intent and whether my client meant to do
it, and what hand the gun was in, and whether it was wrapped in

21   plastic.

His recollection is going to become very important.  As far as the

22   metabolites, the one ingredient in marijuana is THC, so I don't
consider the metabolite THC to be a metabolite; I consider that to

23   be the actual ingredient.

I will concede that if it is going to be a trade-off where if the

24   marijuana comes in, so does meth use, then I will certainly back off
the marijuana use.  I think the use of meth would be more

25   prejudicial than the use of marijuana.

THE COURT:  Well, I don't think I need to rule on that now

26   because we're probably not going to get to opening statements.  So

1    I think I'll take it under submission, but I will give a fair warning
     as to what my ruling will be.
2    MR. OMURA:  All right.
     THE COURT:  It sounds to appear superficially for both offers of
3    proof there is going to have to be some foundation first.
     MR. OMURA:  Like I said, Your Honor, my deputy sheriffs will
4    be able to testify from their common experience and training about
     the effects of methamphetamine.
5    THE COURT:  That is the effects.  There would need to be a
     foundation, in fact, there was some used.
6    MR. OMURA:  The victim would testify in the past when the
     defendant has done this, that is what he's doing; is smoking
7    methamphetamine.
     THE COURT:  Well, that is the foundation that I'm leery about.
8    MR. WILSON:  Sounds more like habit than what happened that
     particular day.
9    THE COURT:  It is something different than having him tested.

10   (Reporter's Tr. at p. 1-5.)  The court reserved judgment.  Subsequently, but still before trial

11   began, the following colloquy took place on the issue between the parties and the trial judge:

12   THE COURT:  Now what about the methamphetamine?
     MR. OMURA:  I have not been able to talk with my victim to
13   support or short-circuit his testimony.  I will be meeting him over
     the lunch hour and so I will – whatever the Court's instructions are,
14   I will be able to tell him.
     My understanding is, he has personal knowledge.  And I'm not
15   sure upon what that is based, that the Defendant used
     methamphetamine, and when he does, he acts in a certain way, as
16   we described yesterday morning.
     THE COURT:  Would he be giving his opinion that he was under
17   the influence of methamphetamine at the time of the alleged
     incident?
18   MR. OMURA:  Both before and during the terms of arguments,
     yes.
19   THE COURT:  Okay.
     MR. OMURA:  And again it's based on – my understanding, it's
20   his personal knowledge of the Defendant's habits, having lived in
     his house.
21   Now I don't know whether or not Nicholas Scoma has ever seen
     methamphetamine in the Defendant's possession or actually seen
22   him smoke it.  I don't know those particulars.  That's what I'm
     going to find out at lunchtime.
23   THE COURT:  Let's just stay with that issue for a minute.
     Mr. Wilson, sounds to me like what we're confronted with here is
24   the perspective opinion by a lay witness as to the condition of the
     Defendant due to the use of a substance.  Cases are pretty clear that
25   a lay witness can testify as to whether or not a person appeared to
     be under the influence of alcohol.  I don't know why the same
26   general rule wouldn't apply to the use of a drug such as

13

methamphetamine, but I'm open on the subject.

MR. WILSON:  Well, the problem we have, your Honor, is that alcohol has certain very objective outgoing symptoms, and alcohol is not illegal.  It's common.  So I think all of us have been around people that drink.  We can smell it, we can see people's demeanor.  The foundation I think for – that before a lay person can say that:  I believe he's under the influence of methamphetamine, is that person either hangs around with users, watches them use, sees what happens to them or he himself is a user.  So I'm not sure what type of foundation you could have to say, yes, this person was under the influence of methamphetamine.

And as Mr. Omura knows and/or the Court should know, is that during the preliminary hearing we addressed the issue of whether any methamphetamine was found in the residence, and the answer is no.  So if there was no methamphetamine found in the residence, then how – is Mr. Scoma running back and forth to his bedroom using methampheatmine.

THE COURT: Well, you're basically saying there doesn't appear to be foundation that's going to be established.

MR. WILSON: Well, I think it would be a difficult foundation as compared to your saying, you know, the analogy of alcohol, because alcohol has been the conservative drug of the masses for years.  Methamphetamine, fortunately, hasn't been.

I think that we can probably wait until, you know, after the break, so Mr. Omura can talk to Nicholas, because my tendency is this – is that I think that the introduction of methamphetamine against my client would be much more prejudicial than any questioning regarding the use of marijuana by the victim here.

THE COURT:  Well, I know you gentlemen maybe do this, but I don't equate the two things.  To me they are two separate issues, and I'm going to want them separately.

MR. WILSON:  Well, I believe that the way that Mr. Omura put it was that he wasn't planning on introducing this unless I entered into the marijuana analysis.

THE COURT:  Well, that's his decision, but that doesn't really alter what I have to do.

Well, Mr. Omura, I'm going to rule temporarily that this conduct not be used in opening statement.  And if you want to establish a foundation through someone – I guess it would be the victim – I will permit you to do that outside the presence of the jury, when we actually get him here, so we can find out what it is he has to say . . . .

MR. WILSON:  Now we're moving onto the marijuana?

THE COURT:  Yes.  Now that seems to me to be different.  Your claim that the victim was tested for marijuana in the hospital and actually had – what; T.H.C.?

MR. WILSON:  Yeah, T.H.C.

THE COURT:  T.H.C.  And how is that relevant?

MR. WILSON:  The only relevance I have, your Honor, is that I'm not standing here saying that marijuana makes you violent, that marijuana, you know, in any way like P.C.P. or something that's

14

1    going to make you violent.  But it's more or less common
     knowledge, if I could lay the foundation, that it certainly does mess
2    up your short-term memory.  And if a person is under the influence
     of marijuana and he is the only eye witness to what the People
3    charge as an attempted murder, then I believe there are
     inconsistencies in his statement and marijuana may be or T.H.C.
4    may be a contributing factor.
     THE COURT:  Having to do with temporary memory loss?
5    MR. WILSON:  Recollection and memory loss as to the
     occurrence, you know, how the events occurred.
6    THE COURT:  And is Dr. Hatter going to give an opinion on that
     subject, do you believe?
7    MR. WILSON:  Well, my only purpose of Hatter would be to lay
     the foundation for the medical records.  But of course the medical
8    records I believe were – I believe they are in, because you sent a
     Subpoena D.T.  So I think I could actually introduce the test.
9    The question is that without Dr. Hatter, the mere fact of the T.H.C.
     shows – I'm not sure if I could get that to the jury.
10   THE COURT:  Well, I'm not sure.  It seems to me if you are going
     to admit something that's in this day prejudicial – I'm not sure how
11   prejudicial it is, but it's somewhat prejudicial – don't you have to
     connect that up with – by some sort of evidence that it does
12   contribute to a possible memory loss.
     MR. WILSON:  I can certainly lay that foundation through the
13   victim himself, whether he's experienced that.  And of course, like
     I say, Mr. Omura has subpoenaed Dr. Hatter.  As far as I know, we
14   don't even know whether it's been effected . . . .
     THE COURT: . . . I think on the marijuana, based on what you told
15   me, that unless you really need to mention it in opening statement,
     that I would reserve judgment on that until I hear what the
16   foundation is.

17   (Id. at p. 13-20.)  Subsequently, during trial, the prosecutor stated that Dr. Hatter would not be

18   able to lay the foundation as to the pharmacology of marijuana.  Petitioner's trial counsel then

19   stated that he "decided not go into that area anyway."  (Id. at p. 233.)

20          Petitioner fails to show that the state court's decision on this Claim was an unreasonable

21   application of clearly established federal law or resulted in a decision that was based on an

22   unreasonable determination of the facts in light of the evidence presented in state court.  See 28

23   U.S.C. § 2254(d).  Petitioner cannot overcome the "strong presumption" that trial counsel's

24   decision not to seek to impeach Nicholas with his prior marijuana use at trial was a reasonable

25   tactical decision.  See Strickland, 466 U.S. at 689.  As the record above indicates, counsel was

26   aware of the various issues surrounding the introduction of the marijuana use as well as the

15

1    possible harmful effects that the introduction of Petitioner's methamphetamine use could have on

2    his case.  The record indicates that counsel concluded that a trade-off would be in the best

3    interest of his client.  Because that decision reflects a judgment about the strengths and possible

4    weaknesses of both items of testimony, it cannot necessarily be second-guessed on federal habeas

5    review.  See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation

6    of law and facts relevant to plausible options are virtually unchallengeable."); Silva v. Woodford,

7    279 F.3d 825, 844 (9th Cir. 2002) (noting that United States Supreme Court precedent dicates

8    that counsel commits no error when he makes an informed strategic decision.")

9           Petitioner argues that counsel did not make an informed decision on the "trade-off" of

10   testimony because the methamphetamine would not have been admitted into evidence.  In

11   support of his argument, Petitioner argues that the trial court indicated that the methamphetamine

12   use "[s]ounds more like habit."  However, as the quoted transcript on the issue indicates above,

13   that was in fact Petitioner's trial counsel's argument to the trial court as to why the

14   methamphetamine use should not be admitted.  Ultimately, the court reserved judgment on the

15   issue as it did on the marijuana issue.  Under these circumstances, Petitioner cannot show that the

16   state court's decision was an unreasonable application of clearly established federal law.  His

17   trial counsel's decision not to attempt to impeach Nicholas with his marijuana did not fall below

18   an objective standard of reasonableness.  See, e.g., Dows v. Wood, 211 F.3d 480, 487 (9th Cir.

19   2000) (trial counsel's strategy for impeaching a witness involves tactical decisions that are given

20   great deference).

21          In support of his argument that his trial counsel's performance fell below an objective

22   standard of reasonableness, Petitioner cites to Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir.

23   2006).  In Reynoso, the Ninth Circuit examined whether trial counsel was ineffective when she

24   failed to investigate and cross-examine witnesses about their knowledge of receiving a

25   substantial payment of reward money if their testimony helped convict the defendant.

26   Ultimately, the Ninth Circuit held that while trial counsel is typically afforded leeway in making

16

tactical decisions regarding trial strategy, she cannot be said to have made a tactical decision

without first procuring the information necessary to make such a decision.  See id. at 1112.  The

Ninth Circuit explained:

> If, as she testified, Reynoso's trial counsel was ignorant of the fact
> that Mendoza and Terrones knew and had inquired about obtaining
> the reward, counsel's failure to investigate the issue was not
> objectively reasonable.  It is undisputed that counsel knew prior to
> trial that a reward had been offered, and that she possessed police
> interview transcripts in which the reward was discussed.  Counsel
> also knew that the State intended to call both Mendoza and
> Terrones as witnesses.  Further, she testified that the prosecutor
> had told her that both Lopez and Hinojosa sought rewards.  As the
> magistrate judge concluded, "[a]rmed with knowledge of the
> reward and the fact that two other witnesses knew of the reward,
> defense counsel should have, at a minimum, determined if the only
> two eyewitnesses to the robbery also knew about the reward."
> *Unlike other impeachment evidence presented at trial – for
> example, evidence attacking the witnesses' general credibility or
> demonstrating the inconsistency in their statements – such
> information provided the jury with a reason why the witnesses
> would have had a motive to lie, especially as they had inquired as
> to their ability to college the reward.*  See Stephens v. Hall, 294
> F.3d 210, 224 (1st Cir. 2002) ("A colorable showing of bias can be
> important because, unlike evidence of prior inconsistent statements
> – which might indicate that the witness is lying – evidence of bias
> suggests why the witness might be lying.").  Such cross-
> examination, as Reglos herself ultimately conceded, at least with
> respect to Mendoza, would not have been inconsistent with her
> defense strategy and would have exposed a strong motive for
> witness bias on the part of the State's only two eyewitnesses.  For
> these reasons, if counsel had no more than general information
> about the existence of the reward, her failure to investigate the
> issue with respect to Mendoza and Terrones rendered her
> performance deficient under Strickland.
>
> The same is true even if Reglos did have some direct knowledge
> that Mendoza and Terrones knew about the reward.  Such a limited
> understanding would not have relieved Reglos of her duty to
> investigate; it would have heightened that duty.  Just as, according
> to the magistrate judge, counsel's knowledge of the existence of
> the reward and Lopez and Hinojosa's interest in it made it more
> unreasonable for her to fail to determine whether Mendoza and
> Terrones had a similar financial interest, knowledge that Mendoza
> and Terrones were aware of the reward would have made it all the
> more important for Reglos to determine whether they had actively
> sought it and whether they believed that their ability to obtain the
> financial compensation depended upon their testimony inculpating
> or convicting Reynoso.

1    Given the inadequacy of Reglos's investigation into Mendoza and
2    Terrones's motives for testifying against Reynoso, her failure at
     trial to cross-examine Mendoza and Terrones about the reward
3    further rendered her performance deficient.

4    Reynoso, 462 F.3d at 1113-14 (emphasis added).

5          Reynoso is distinguishable from Petitioner's case.  By way of example only, unlike

6    impeaching the witnesses with the reward evidence which gave them a motive to lie in Reynoso,

7    the evidence at issue in Petitioner's case (the victim's marijuana use) was general credibility

8    evidence that the Ninth Circuit singled out was different than the evidence at issue in Reynoso.

9    Furthermore, as the discussion between counsel and the trial court indicates, Petitioner's trial

10   counsel was aware of this evidence as well as the foundational issues that surrounded it.  Under

11   these circumstances, Reynoso does not lead to a conclusion that Petitioner's trial counsel's

12   performance fell below an objective standard of reasonableness.   Petitioner fails to overcome the

13   strong presumption that counsel's performance fell within the wide range of professional

14   assistance.

15          ii.  Maximum Prison Time

16          In Petitioner's second ineffective assistance of counsel argument, he asserts that counsel

17   led him to believe that the maximum sentence he could receive was being placed on probation.

18   (See Pet'r's Points & Auth. Supp. Am. Pet. at p. 52 ("Throughout the handling of Mr. Scoma's

19   case Mr. Wilson let him to believe that he would only face being placed on probation.")

20   Petitioner fails to show that he is entitled to federal habeas relief on this Claim.  A review of the

21   record indicates that at a settlement conference, Petitioner was presented with the prosecution's

22   proposed settlement of life imprisonment.  (See Clerk's Tr. at p. 38.)  Petitioner rejected the

23   prosecutor's offer.  If the prosecutor was offering a settlement of life imprisonment, Petitioner

24   was aware that his possible maximum exposure to punishment was beyond mere probation.

25   Furthermore, during a discussion on the number of peremptory challenges each side would have

26   during jury selection, the prosecutor reiterated that this was a charged "life" crime.  (See

18

1  Reporter's Tr. at p. 8.)  Thus, Petitioner fails to show that he is entitled to federal habeas relief on

2  this Claim as he was aware by the court proceedings that the maximum exposure he had was life

3  imprisonment.

4                    iii.  Pre-sentence report statements and victim impact statements at sentencing

5          Next, Petitioner asserts that trial counsel was ineffective in that he failed to object to the

6  use of a victim impact statement and the statements within the presentence report at sentencing.

7  Petitioner fails to show that a victim impact statement at sentencing violated his due process

8  rights in this non-capital case.  See United States v. Santana, 908 F.2d 506, 507 (9th Cir. 1990)

9  (per curiam) ("We have recently upheld the use of victim impact statements for sentencing in

10  non-capital cases."); see also, Mahan v. Cate, Civ. No. 08-4699, 2009 WL 3244911, at *2 (C.D.

11  Cal. Oct. 2, 2009) ("Petitioner has not shown that the Supreme Court has spoken on the use of

12  victim impact statements, of any kind, in noncapital cases.") Thus, Petitioner is not entitled to

13  federal habeas relief that a victim impact statement violated his due process rights.

14          Next, Petitioner argues that the presentence report violated his due process rights because

15  it contained inadmissible hearsay.  Petitioner is also not entitled to federal habeas relief on this

16  ineffective assistance of counsel claim.  At the outset, the Confrontation Clause is not applicable

17  under these circumstances at Petitioner's sentencing.  See United States v. Petty, 982 F.2d 1365,

18  1369 (9th Cir. 1993).  Additionally, it is worth noting that the United States Supreme Court has

19  explained that, "federal judges have long relied upon a presentence report, prepared by a

20  probation officer, for information (often unavailable until after trial" relevant to the manner in

21  which the convicted offender committed the crime of conviction." United States v. Booker, 543

22  U.S. 220, 250 (2005).  Thus, Petitioner's trial counsel was not ineffective for failing to object to

23  the presentence report at sentencing.  Cf. United States v. Powell, 650 F.3d 388, 392 (4th Cir.

24  2011) ("In a line of cases beginning with Crawford v. Washington, 541 U.S. 36 (2004), the

25  Supreme Court has held that the Confrontation Clause generally bars the use of testimonial

26  hearsay at trial unless the declarant is not available to testify and the defendant had a prior

1    opportunity to cross-examine him.  See, e.g., Michigan v. Bryant, 131 S.Ct. 1143, 1153 (2011).

2    But nothing in these cases states that the confrontation right applies at sentencing; indeed, they

3    suggest precisely the opposite.") (footnote omitted), cert. denied, No. 11-5824, 2011 WL

4    4536365 (U.S. Oct. 3, 2011).

5        Petitioner relies on the Due Process Clause in support of this argument.  The Ninth

6    Circuit has explained that the use of hearsay evidence during sentencing only requires a minimal

7    indicia of reliability.  See United States v. Littlesun, 444 F.3d 1196, 1199 (9th Cir. 2006).

8    Petitioner asserts that various statements included in the presentence report that were made by

9    the victim were hearsay that lacked this minimal indicia of reliability.  Specifically, Petitioner

10    complains about the victim's statement that Petitioner used a "crack pipe," pointed a gun at his

11    youngest son while sleeping and the probation officer's opinion that he was belligerent towards

12    children and law enforcement.  (See Pet'r's Mem. Points & Auth. Supp. Am. Pet. at p. 54.)  Even

13    assuming *arguendo* that these statements lacked the minimally required indicia of reliability,

14    Petitioner still would not be entitled to federal habeas relief on this argument.  At the time

15    Petitioner was sentenced, California law required that the trial court impose the middle term if

16    there were three possible terms for the conviction unless there were circumstances in aggravation

17    or mitigation of the crime.  See Cal. Penal Code § 1170(b).  Petitioner was sentenced to the

18    middle term of three years for the attempted voluntary manslaughter conviction (along with the

19    middle term for the § 12022.5(a) use of a firearm enhancement).[3]  Thus, even if counsel had

20    objected to these purported hearsay statements within the presentence report, he fails to show to a

21    reasonable probability that the outcome of the proceeding (his sentence) would have been

22    different in light of the imposition of the middle terms.

23        For the foregoing reasons, Petitioner is not entitled to federal habeas relief on any of his

24    arguments within Claim II.

25

26        [3] The § 12022.7 inflicting great bodily injury while attempting a felony enhancement does not have a middle term.

20

C.  Claim III

In Claim III, Petitioner argues that the cumulative effect of his trial counsel's errors as discussed in Claim II along with the errors of the trial court in Claim I rendered his trial fundamentally unfair and violated his due process rights.  The combined effect of multiple errors may give rise to due process violation if the trial was rendered fundamentally unfair, even where each error considered individually would not require reversal.  See Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).  The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive" thereby having a "substantial and injurious effect or influence" on the jury's verdict.  See id. at 927 (quoting Brecht, 507 U.S. at 637).  Cumulative error is more likely to be found when the government's case is weak.  See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).

Many of the alleged errors that Petitioner argues in Claims I and II support his cumulative error argument were not in fact errors.  Furthermore, as described infra, Part V.E, this was not a weak case against Petitioner.  There was ample evidence in the record to support the attempted voluntary manslaughter conviction such that Petitioner failed to show that his due process rights were violated due to cumulative error.

D.  Claim IV

In Claim IV, Petitioner argues that his appellate counsel was ineffective.  Petitioner argues that "[b]ecause the instructional issue and ineffective assistance arguments were so apparent from the record and trial counsel's errors were so egregious in the context of petitioner's case, appellate counsel should have taken notice and included them in the appeal." (Pet'r's Points & Auth. Supp. Am. Pet. at p. 64-65.)  Ineffective assistance of appellate counsel uses the same Strickland standard that applies to trial counsel.  See Smith v. Robbins, 528 U.S. 259, 285 (2000).  In this case, Petitioner's arguments with respect to the purported instructional error and trial counsel's ineffective assistance of counsel argument were not meritorious as

21

1    explained <u>supra</u> Part V.A & B.  Thus, Petitioner fails to show to a reasonable probability that the

2    outcome of the proceeding would have been different had appellate counsel raised these issues

3    on direct appeal.  Claim IV should be denied.

4         E.  Claim V

5        In Claim V, Petitioner argues that there was insufficient evidence to convict him of

6    attempted voluntary manslaughter.  The last reasoned decision on this Claim was from the

7    California Court of Appeal on direct appeal which stated the following:

> Defendant's sole contention on appeal is there was insufficient evidence of intent to kill to support his attempted voluntary manslaughter conviction.  "To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt.  In this process we must view the evidence in the light most favorable to the judgement and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole."  (<u>People v. Johnson</u> (1993) 6 Cal.4th 1, 38.)
>
> The distinction between murder and voluntary manslaughter, and thus between attempted murder and attempted voluntary manslaughter, lies in the existence of malice.  (<u>People v. Lasko</u> (2000) 23 Cal.4th 101, 108 (<u>Lasko</u>).)  A person who unlawfully attempts to kill nonetheless lacks malice – and is guilty of attempted voluntary manslaughter – if his "reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]" (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 163.)  One can commit voluntary manslaughter either with an intent to kill or with a conscious disregard for life.  (<u>Lasko</u>, <u>supra</u>, 23 Cal.4th at pp. 109-110.)  However, "attempted voluntary manslaughter cannot be premised on the theory defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing."  (<u>People v. Gutierrez</u> (2003) 112 Cal.App.4th 704, 710.)
>
> A defendant's intent is rarely proved through direct evidence.  "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots.  Absent such direct evidence, the intent obviously must be

derived from all the circumstances of the attempt, including the putative killer's actions and words.  Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact."  (People v. Lashley (1991) 1 Cal.App.4th 938, 945 (Lashley).)

In Lashley, the defendant shot the victim with a .22-caliber rifle from a balcony, piercing his chest and arm, after previously threatening the victim and his companions from that distance that he would send someone down "'to kick ass.'"  (Lashley, supra, 1 Cal.App.4th at p. 942.)  "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance.  (Id. at p. 945.)  The court concluded:  "[t]he very act of firing a .22-caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill under the circumstances presented here."  (Ibid.)

Defendant asserts the evidence supports an accidental rather than intentional firing.  He characterizes the evidence presented to the jury as reflecting "a spontaneous struggle and argument between an older, infirm man and his younger son, which continued for half and hour, in which each side landed verbal and physical blows."  Defendant had been fidgeting with the gun and "Nicholas's sudden verbal outburst, accompanied by spitting at his father, occasioned an excited and accidental, rather than a single-minded and purposeful shooting."  In support of this conclusion defendant notes his look of surprise after shooting his son, he never threatened to kill him, the gun was in his left hand, Nicholas did not know what defendant intended, and evidence showing the plastic bag could have been over the gun when it fired.

Defendant's claims are not supported by the record.  There is no evidence defendant and the victim were struggling when Nicholas was shot.  Nicholas's uncontradicted testimony establishes that he neither threatened defendant nor reached for the gun before he was shot.  While the two had pushed each other earlier, Nicholas was only yelling at defendant at the time of the shooting.

Defendant's contention that the gun was in his left hand is also unsupported.  On cross-examination, defense counsel asked Nicholas whether he told the police that defendant held the gun in his nondominant left hand.  Nicholas never answered the question.  A tape of the interview and transcript were presented to the jury.  However, neither the tape nor the transcript is in the appellate record.  Appellate review is limited to evidence that was before the trial court and is in the appellate record.  (See People v. Waidla (2000) 22 Cal.4th 690, 703, fn. 1.)  Since Nicholas testified at trial that defendant held the gun in both hands, defendant's claim is without support.

23

1

2      Defendant's expert testified that the plastic bag either could have
       been over the revolver or at its side during the shooting.  We will
3      not substitute our judgment of the jury's decision to interpret this
       evidence to support defendant's guilt rather than his innocence.
       (See <u>People v. Perez</u> (1992) 2 Cal.4th 1117, 1124.)

4

5      The fact that defendant did not state an intent to kill only means the
       prosecution had to make its case through circumstantial evidence.
6      (<u>Lashley</u>, <u>supra</u>, 1 Cal.App.4th at p. 945-946.)  There is ample
       circumstantial evidence supporting intent to kill.  Defendant tried
7      to hit his victim in the head with a metal baseball bat.  After the
       shooting, defendant fabricated a story to the emergency operator,
8      saying the gun accidently went off when both he and Nicholas
       reached for it in the dog biscuit box during the fight.  Most
9      importantly, defendant drew a gun on the unarmed Nicholas, and
       did not put it down until he shot Nicholas in the chest at close
10     range.

11     Intent to kill does not require substantial deliberation.  "[I]f the jury
       found defendant's use of a lethal weapon with lethal force was
12     purposeful, an intent to kill could be inferred, even if the act was
       done without advance consideration and only to eliminate a
13     momentary obstacle or annoyance."  (<u>People v. Arias</u> (1996) 13
       Cal.4th 92, 162.)  Therefore, defendant's raised eyebrows and wide
14     eyes do not negate the evidence supporting an intent to kill.
       Defendant was not in a physical struggle with defendant when he
15     shot Nicholas, so the jury could reasonably conclude that the
       shooting was purposeful.  Since firing a .38 caliber pistol at the
16     chest at close range is unquestionably using a lethal weapon with
       lethal force, there is substantial evidence of intent to kill.

17     Evidence of defendant's motive supports our conclusion.  Nicholas
       spitting on him, even if accidental, was a motive for the killing
18     when viewed in the context of the extended altercation between the
       two.  A motive for shooting the victim is probative of defendant's
19     intent to kill.  (<u>People v. Smith</u> (2005) 37 Cal.4th 733, 741.)  While
       "motive alone may not always fully explain the shooter's
20     determination to shoot at a fellow human being with lethal force"
       (<u>ibid.</u>), the evidence of defendant's motive is additional evidence
21     of intent to kill.

22     Our "sole function is to determine if *any* rational trier of fact could
       have found the essential elements of the crime beyond a reasonable
23     doubt."  (<u>Lashley</u>, <u>supra</u>, 1 Cal.App.4th at p. 946.)  Substantial
       evidence supports the jury's verdict that defendant intended to kill
24     Nicholas.

25  (Slip Op. at p. 4-9.)

26         The Due Process Clause of the Fourteenth Amendment "protects the accused against

                                          24

1   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

2   crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient

3   evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the

4   prosecution, any rational trier of fact could have found the essential elements of the crime beyond

5   a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question

6   under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

7   a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

8   443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

9   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

10  process grounds."  Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the

11  writ, the habeas court must find that the decision of the state court reflected an unreasonable

12  application of Jackson and Winship to the facts of the case.  See id.

13          A federal habeas court determines sufficiency of the evidence in reference to the

14  substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

15  324 n.16; Chein, 373 F.3d at 983.  Under California law, in order to prove that Petitioner was

16  guilty of attempted voluntary manslaughter, the State had to show:  (1) a direct but ineffectual act

17  was done by one person towards killing another human being; (2) that person had the specific

18  intent to kill the other person; and (3) the actions taken to kill were unlawful.  See CALJIC 8.41.

19   Petitioner argues that there was insufficient evidence to convict him of attempted voluntary

20  manslaughter because the evidence did not show that he had the intent to kill Nicholas.

21          Petitioner is not entitled to habeas relief on Claim V.  Petitioner's argument that there

22  was a lack of a showing of a specific intent to kill Nicholas fails when the evidence is viewed in

23  the light most favorable to the prosecution,.  Because there is rarely direct evidence of a

24  Petitioner's intent to kill, intent must usually be established by circumstantial evidence, including

25  the Petitioner's actions.  See People v. Smith, 37 Cal. 4th 733, 741, 37 Cal. Rptr. 3d 163, 124

26  P.3d 730 (2005); People v. Ramos, 121 Cal. App. 4th 1194, 1207-08, 18 Cal. Rptr. 3d 167

1  (2004) ("Generally, the question whether the defendant harbored the required intent must be

2  inferred from the circumstances of the shooting.").

3          Here, the California Court of Appeal aptly described the circumstantial evidence which,

4  when viewed in the evidence most favorable to the prosecution supported a showing that

5  Petitioner had an intent to kill.  First, the victim was shot after he spit on the Petitioner.

6  Petitioner said to the victim, "you spit on me."  Petitioner then wiped the spit off onto the victim

7  and then the victim was shot.  (See Reporter's Tr. at p. 59, 68.)  As noted, the spitting incident

8  could have given rise to a motive for the intent to kill the victim.  Furthermore, Petitioner swung

9  a metal baseball bat at the victim and told him that "I'll hit you in your fucking head."

10  (Reporter's Tr. at p. 104, 110-11.)  The Petitioner also gave an inconsistent statement to the 911

11  operator as to what had actually transpired.  Finally, even Petitioner's own expert testified that

12  the trigger must be pulled in order for the gun to fire.  (See Reporter's Tr. at p. 276-77.)  This

13  evidence, when viewed in the light most favorable to the prosecution, warrants denying habeas

14  relief on this insufficiency of the evidence Claim.

15                          VI.  REQUEST FOR AN EVIDENTIARY HEARING

16          Petitioner requests an evidentiary hearing.  A court presented with a request for an

17  evidentiary hearing must first determine whether a factual basis exists in the record to support

18  petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  Baja v.

19  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166

20  (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has

21  presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To show

22  that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would

23  entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation

24  marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons

25  stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim for federal

26  habeas relief.  Moreover, the Supreme Court has recently held that federal habeas review under

                                              26

1  28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated

2  the claim on the merits" and "that evidence introduced in federal court has no bearing on" such

3  review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his request will be

4  denied.

5                                          VII.  CONCLUSION

6         Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

7  hearing is DENIED.

8         For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for

9  writ of habeas corpus be DENIED.

10        These findings and recommendations are submitted to the United States District Judge

11 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

12 after being served with these findings and recommendations, any party may file written

13 objections with the court and serve a copy on all parties.  Such a document should be captioned

14 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15 shall be served and filed within seven days after service of the objections.  The parties are

16 advised that failure to file objections within the specified time may waive the right to appeal the

17 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

18 elects to file, Petitioner may address whether a certificate of appealability should issue in the

19 event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

20 Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

21 when it enters a final order adverse to the applicant).

22 DATED:  October 28, 2011

23

24                                          _____

25                                          TIMOTHY J BOMMER
                                           UNITED STATES MAGISTRATE JUDGE
26